1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                              S3 11 Cr. 605 RJS

5  RANDY WASHINGTON, a/k/a
   Sealed Defendant 1,

6
                   Defendant.
7
   ------------------------------x
8

9

10                                          December 3, 2014
                                            10:55 a.m.
11

12

13  Before:

14                    HON. RICHARD J. SULLIVAN,

15                                           District Judge

16

17                         APPEARANCES

18

19  PREET BHARARA,
         United States Attorney for the
20       Southern District of New York
    TELEMACHUS PHILIP KASULIS,
21  CHRISTOPHER JOSEPH DiMASE,
         Assistant United States Attorneys
22

23  DAVID ANDREW GORDON,
    IRA LONDON,
24       Attorneys for defendant Washington

25

1          (In open court)

2          (Case called)

3          THE COURT:  Good morning to you, Mr. Washington.

4          THE DEFENDANT:  Good morning.

5          THE COURT:  We are here for sentencing.  We had a

6    conference on Monday that was designed to address the issue of

7    the government's offer.  Mr. London was appointed before

8    Thanksgiving to provide sort of a second opinion to

9    Mr. Washington with respect to the government's offer, which

10   was to basically withdraw or to dismiss the second 924 (c)

11   count which has a 25-year-mandatory-consecutive sentence.

12   Mr. Washington had indicated he was not inclined to take that

13   offer because it involved a requirement that he waive certain

14   appellate rights.

15          Nonetheless, I think I decided it couldn't hurt and

16   might be useful to have another lawyer, Mr. London, appointed

17   for the purpose of just conferring and consulting with

18   Mr. Washington concerning this offer.  So the purpose of

19   Monday's conference was to see whether or not Mr. Washington

20   wished to take the offer or not after having had a chance to

21   consult with Mr. London.

22          I was advised on Monday by the Marshal's Service

23   Mr. Washington refused to come out of his cell, refused to come

24   to court.  So I wanted to just first, now that Mr. Washington

25   is here, figure out what did happen on Monday, Mr. Gordon?

1              MR. GORDON:  Mr. Washington advises he was ill.

2              THE COURT:  What was the nature of the illness?

3              MR. GORDON:  He was throwing up.

4              THE COURT:  All right.  Okay.  Look, if that is the

5     case, Mr. Washington, if that is the case in the future, it is

6     best to let your lawyers know if you can contact them.

7              We had a conference on Monday in which we just

8     discussed the offer.  Mr. London represented to me that he had

9     met with you and discussed with you the offer made by the

10    government and that you were still not inclined to take that

11    offer if it involved the waiving of certain appellate rights.

12             I want to make sure that that is, in fact, your

13    position.  You had a chance to walk with Mr. London?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Do you feel you had enough time to discuss

16    with him --

17             THE DEFENDANT:  Yes.

18             THE COURT:  -- this offer the government has made?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Do you feel you now are comfortable making

21    a decision with respect to that offer?

22             THE DEFENDANT:  No.

23             THE COURT:  Well, I don't think I asked the question

24    well.  So let me just say, have you reached a decision as to

25    whether or not you want to take that offer?

THE DEFENDANT: Yeah, I don't want to take it.

THE COURT: You do not want to take that offer?

THE DEFENDANT: No.

THE COURT: Do you understand the government's offer involved them withdrawing or dismissing the second gun count that carries with it a 25-year-mandatory-consecutive sentence, and so if the government were to withdraw that or dismiss that conviction, then the maximum -- well, the mandatory sentence I would have to impose would be 25, but not more than 25. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: By turning down this deal, you understand that the government will then not dismiss the 25-year-mandatory consecutive count, which means the lowest that I can sentence you to is 50 years. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: I don't frankly wish to sentence you to 50 years. If left to my own devices, I wouldn't, but I will have no choice. I will have no choice but to impose a sentence of 50 years or at least 50 years as a result of your turning down this plea. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: All right. Let me ask the government, are there any other questions you would like me to ask Mr. Washington?

1          MR. KASULIS:  I don't think so.  I have one point of

2     clarification.  When initially we had these discussions with

3     Mr. Washington's counsel about our willingness to nolle, to

4     dismiss the second consecutive 924 (c) count, we indicated that

5     we expected the guidelines range for the remaining counts to

6     match that in the PSR, leaving out the 25-year-consecutive

7     penalty that would be eliminated in the proposed deal.

8          As we went back through the PSR to prepare for

9     sentencing, we realized, of course, the two-level drug

10     reduction across the board applies to Mr. Washington, so the

11     guidelines range for the offer, although it wasn't a formal

12     offer on paper, but the discussion is slightly off.

13          It still sounds like Mr. Washington does not want to

14     take the deal which involves the dismissal of the

15     25-year-consecutive-mandatory penalty.  I want to make that

16     clear, the guidelines range would be slightly different.

17          THE COURT:  We'll talk about the guidelines in a

18     moment.  It seems to me the mandatory minimums and consecutives

19     are what are driving the sentences here.

20          MR. KASULIS:  Yes.

21          THE COURT:  And driving the determinations.  Let me

22     ask Mr. London or Mr. Gordon, is there anything else you would

23     like me to ask Mr. Washington?

24          MR. LONDON:  Not for me.

25          THE COURT:  Mr. Gordon?

1          MR. GORDON:  No, your Honor.

2          THE COURT:  Let me ask the government, I guess on

3    Monday I asked the government to at least consider whether this

4    was the right thing, as that term is very generally used, and

5    so we had a somewhat lengthy discussion about the wisdom and

6    justice of a sentence of 50 years on these facts.  I asked the

7    government to consider whether the waiver of appellate rights

8    was really an essential component to its decision to dismiss

9    the second 924 (c) count.

10          Mr. Kasulis?

11          MR. KASULIS:  Again, your Honor, we went back and

12   discussed this matter with people in the office above my level,

13   the Chief of the Criminal Division, Deputy United States

14   Attorney.  Their view and ours, the government's view is that

15   it is an important part of every, literally every negotiated

16   resolution that my office does.

17          If Mr. Washington wants to take the position that

18   those rights that he wants to keep, which he is obviously

19   entitled to do, if he wants to take the position that those

20   rights to him are worth not reducing his sentence by 25 years,

21   we understand, but we don't want to get in a position of making

22   an exception to the rule that every negotiated disposition we

23   have involves the same agreement.

24          One of the provisions of that agreement is the

25   forfeiture of appellate rights.  As your Honor knows, it is not

1    even a forfeiture of appellate rights with regard to

2    ineffective assistance of counsel.  That is not carved out.

3           THE COURT:  You're not carving it out.  It is not a

4    waivable right.

5           MR. KASULIS:  I don't want to make it sound like the

6    government's largess.  If this is the concern he has or had in

7    the past, he would be able to make that claim on appeal or on

8    collateral attack.  It is the balance of whatever appellate

9    rights and collateral attack rights he is interested in

10   pursuing he is deciding is worth the 25-year risk.

11          THE COURT:  Right.  You are also deciding that it is

12   worth it to have Mr. Washington spend an extra 25 years in jail

13   rather than alter a policy that normally has people waiving

14   appellate rights as part of a plea agreement.  The normal

15   policy is not to dismiss counts of conviction after a trial.

16   The decision to do that was based on the somewhat unusual

17   circumstances of what appears to be an unjust or certainly

18   overly long sentence given the conduct here and given what the

19   original plea offer was.

20          So it would seem to me, not that I am in a position to

21   tell you what to do, but it would seem to me this rigid

22   adherence to policy is not terribly persuasive in a situation

23   that is unique enough to prompt the office to alter its usual

24   policy with respect to post-conviction relief?

25          MR. KASULIS:  As you can imagine, we see it slightly

1    differently.  We are actually abandoning our standards policy

2    of respecting jury verdicts in order to make this offer to him

3    in the first place.

4              THE COURT:  That is because there is a conclusion that

5    a 50-year sentence is unwarranted, and that is a conclusion

6    prosecutors should make, and get to make, frankly have an

7    obligation to make.  It was a decision that was made early on

8    when you decided that a 10-year offer was appropriate in light

9    of the conduct.

10             So, look, we have been over this a couple of times,

11   but I'm not sure that there's great consistency in the position

12   that says we agree that 50 years is too long, but it is only

13   too long if you give up your appellate rights.

14             MR. KASULIS:  That is sort of what we do in every plea

15   disposition in the first place.  We offer someone what we

16   believe is a reasonable offer, with the understanding if they

17   go to trial, the sentencing exposure will be much more severe

18   customarily, and as a part of that plea agreement in every

19   other case, we require the defendant to forfeit his appellate

20   rights.

21             THE COURT:  You should talk to the Attorney General on

22   this.  I can't imagine so great is the policy enunciated with

23   respect to prior felony informations is completely distinct and

24   divorced from a policy that would require somebody to do 50

25   years because they didn't take a plea deal, or they wouldn't

1    waive appellate rights.

2           There is a tension there.  I would love to ask the

3    Attorney General if I get an opportunity, but I can't imagine

4    that he would say no, no, I am fine with that because although

5    851s trouble me, stacking 924 (c)s to punish people for going

6    to trial and not waiving appellate rights is hunky-dory.  That

7    doesn't seem to jibe.

8           MR. KASULIS:  I hear what you're saying completely.

9           It has been clear from the Attorney General's

10   memoranda addressing these issues that at least so far -- and

11   it might change -- he is distinguishing quite clearly drug

12   conduct from violent conduct.  This is a defendant who engaged

13   in multiple armed robberies pistol-whipped victims, trafficked

14   in AK-47s in addition to drug conduct.

15          THE COURT:  Don't get me wrong, I get that.

16          You offered him 10 years for that, and so I think the

17   question you ought to be asking the Attorney General is having

18   offered 10 before trial, are you okay with us requiring 50 when

19   he wouldn't take the deal and 50 because he won't waive certain

20   appellate rights?  Is that in line with the philosophy that

21   seems to be underlying his position on 851, prior felony

22   informations?  It seems to me not.

23          Should I adjourn sentencing and ask you to ask him?  I

24   don't know that I can or should do that.  My hunch is he is

25   soon to be the ex-Attorney General and he won't look with pride

1    on what you guys are doing today.

2            MR. KASULIS:  All I can say is we followed to the best

3    of our ability the Attorney General's memoranda which addressed

4    the drug laws.  We have the nolle for the prior felony

5    information here for your Honor's consideration, as we said we

6    would on Monday.

7            The Attorney General has not addressed violent conduct

8    like this.  In his memoranda on drug conduct, he said we

9    shouldn't even consider going down from a (b)(1)(A) to

10   (b)(1)(B) in the drug context when someone's conduct touches

11   upon violence.  Mr. Washington's conduct here really is violent

12   conduct.

13           THE COURT:  I get that.  There is no way I will give

14   him 10.  You offered him 10.  There is no way I would have

15   given him that.  I don't know what you guys were thinking.  I

16   wouldn't have given him that as the sentencing judge.

17           You offered him 10.  Having offered him 10, and having

18   him turn it down, and you then decided that 50 was the right

19   mandatory sentence, I just think that is inconsistent with the

20   Attorney General's position.  It is not that you had to offer

21   him that.  Having offered that, it seems that the 50 is really

22   designed to punish going to trial.  It is not designed to

23   punish conduct that is really bad conduct, but you didn't think

24   it needed to be punished with more than 10.

25           MR. KASULIS:  I would have to disagree again.

1          The 10-year offer, as your Honor knows, arises out of

2    a variety of considerations.  One is, of course, the conduct.

3    That is the most important aspect of the calculus that leads to

4    the offer.  Another is the assessment of the trial risk.  This

5    became a case with only a single cooperator essentially putting

6    Mr. Washington --

7          THE COURT:  Don't!  This is was an incredibly strong

8    case.  The defendant was on tape talking openly about his drug

9    activity on a phone that he knew was monitored from Rikers

10   Island.  There was strong evidence in this case.

11         He has a right to go to trial, and maybe

12   Mr. Washington hoped or believed that the cooperator would not

13   be believed and that the jury would have trouble on at least

14   some of the counts.  I don't know.  There are a lot of reasons

15   why people go to trial.

16         It is hard for me to believe that you thought you had

17   40 years worth of risk that made a 10-year deal a good one, but

18   that otherwise 50 years is what justice would have required.

19   The disparity is too great.  It is one thing to say we offered

20   him 10 before trial because there was risk, but having gone to

21   trial, he has to take his lumps and do 20, that is something

22   that wouldn't phase me.

23         When it goes all the way to 50, that is really kind of

24   shocking.

25         MR. KASULIS:  I understand your Honor's concern which

1   is why, as you know, we have tried to create this package for

2   Mr. Washington that would allow it to come down to 25.  It is

3   just we are trying to treat Mr. Washington as we would every

4   other defendant who is engaged in a negotiated disposition in

5   this case, and he is not willing to do it.

6           THE COURT:  You haven't tried him like every other

7   defendant in part or primarily because you have recognized this

8   is a case that is unlike most other cases.  To your credit, I

9   think that this is a case where a 50-year sentence would be

10  unjust.  I think a 40-year sentence would also be unjust,

11  although less unjust.

12          MR. KASULIS:  I can tell your Honor the precedential

13  value of attempting to or willing to dismiss the second

14  consecutive 924 (c), we knew that would have consequences, and

15  it is already starting to, as you can imagine.  Defense

16  attorneys are e-mailing the office and saying we want the Randy

17  Washington deal, we want you guys --

18          THE COURT:  This is not happening in a vacuum.  Judge

19  Gleason has written on this in several cases eloquently and

20  spoken on this subject.  There are other districts around the

21  country where there is a recognition of the stacking of gun

22  counts without intervening arrests or convictions can result in

23  incredibly Draconian sentences that are at least in many cases

24  unjust.  There is nothing wrong with saying that, taking that

25  long view of things.  Prosecutors should be commended for doing

that.  The fact that other people may say I want you to take a

look at the second 924 (c), yes, second 924 (c), you know, big

deal.

              MR. KASULIS:  I agree.

              THE COURT:  That doesn't strike me as a terribly

onerous burden on the government as a result of this plea

offer.

              MR. KASULIS:  I agree.  That is not what I was trying

to say.  The second point against that backdrop, if we went

further with Mr. Washington and said in addition to being

willing to not drop the 924 (c) count, we are not going to make

you use the same plea agreement we use in every other case,

that, too, will --

              THE COURT:  There are cases in which you forego a 924

(c), you forego a prior felony information for someone who

doesn't even plea to a plea agreement.  There are cases where

that happens.  I have seen them.  I think it is inaccurate to

say everybody has to take this deal or the world will end as we

know it.  Different cases require different adjustments and

different responses.

              This strikes me as a rare case in which the mandatory

sentence is something that is beyond what is appropriate given

the particular circumstances of this case.  Mr. Washington, his

youth, you know, the sentence that is going to be imposed in

any event, it is not like I was going to give him two and the

1    government had to carry something.  I am not a push-over when

2    it comes to these things.  I am generally considered to be a

3    reasonably tough sentencer when the facts warrant it.

4           As I said, I can't imagine I was ever going to

5    sentence Mr. Washington for less than 20 years for the conduct

6    he engaged in.

7           MR. KASULIS:  Your Honor well knows to the extent this

8    became a precedent, we are willing to nolle after a trial, a

9    guilty finding, dismiss the 924 (c) and not require the

10   defendant to enter into the standard form plea agreement, this

11   will occur in front of all the other judges in the Southern

12   District.

13          I take your Honor's point about your own sentencing

14   practices typically.  As your Honor knows, there is a wide

15   variety of sentencing practices in the Southern District, and

16   our office has to be mindful of that.

17          THE COURT:  I don't think either of us is going to

18   persuade the other.  I don't know that I have the authority to

19   tell you to bring this up to the Attorney General.  This has

20   been raised to the U.S. Attorney who is a

21   presidentially-appointed officer.  I think there is only so

22   much I can do.  Mr. Gordon, Mr. London, is there anything else

23   you would like to say?

24          MR. GORDON:  Your Honor, I know that Mr. Washington is

25   anxious to be sentenced.  If there is any chance the government

1    would take it another level up to the Attorney General, I would

2    think hopefully the Attorney General is as reasonable as you

3    are and more reasonable than the government is being and would

4    see that this is just too much.  I would have no objection and

5    actually request a brief adjournment if they would do that.  I

6    know Mr. Washington wants to get on with this case.

7         With respect to his refusal to accept the government's

8    offer, as I said before, I know your Honor is not going to

9    revisit it, but it is my view that given the chances at trial,

10   given what the original offer was, the only way he was going to

11   do better than that offer was to win every count, was to win

12   the entire case.  That would seem so unlikely that his refusal

13   to accept the offer then, his refusal to accept this now would

14   be based upon some hope that he could win on appeal and get a

15   new trial.

16        I think that is again unrealistic or that maybe get a

17   new trial, but the hope he would do better at a new trial seems

18   to me totally unrealistic and is based upon his cognitive

19   impairment, which I know and I think that further psychological

20   evaluation and a hearing might very well determine that he was

21   not, he was not competent and is still not competent.

22        THE COURT:  All right.  You have drifted into a

23   different point, which is something I have already ruled on,

24   and I am pretty confident in my ruling with respect to

25   Mr. Washington's competence.

1      We can question his judgment, but I don't think that

2   is the same as questioning his competence.  I have already

3   ruled on that.  I think the issue is whether or not I can or

4   should direct the government to raise this to a cabinet level

5   official, the Attorney General of the United States.  I don't

6   think I have the authority to order them to do that.

7      I suppose I could ask them to consider it on these

8   unique circumstances, but that might be something they can

9   handle with a phone call because I don't think Mr. Kasulis,

10  notwithstanding his lofty position now as a unit chief, gets to

11  make these calls for his office.

12      MR. KASULIS:  I do not have a hotline to the Attorney

13  General.  If Mr. Washington is asking us to do that, and your

14  Honor is interested in our trying to explore that, we can try

15  to do it.  I want to make sure Mr. Washington gets as much

16  process as he can.  I don't want to be the limiting factor.

17      THE COURT:  Let's do this.  Mr. Washington, I know you

18  wish to be sentenced today.  That has been conveyed to me.  Is

19  that accurate?  You want to be sentenced today; is that right?

20      THE DEFENDANT:  Yes.

21      THE COURT:  I am inclined to very respectfully ask the

22  government to at least inquire as to whether they're willing to

23  bring this to the attention of the Attorney General or other

24  responsible involved in his policymaking with respect to 851

25  prior felony informations, to see if there is a tension between

1   that policy and the position being taken in this case.  I say

2   that with some hesitation because I don't think judges can or

3   should be directing prosecutors to just go all the way up a

4   chain.  If that were the case, then the entire system could

5   grind to a halt.  I think this is a case that is unique or rare

6   in my experience and it is one that we spent a lot of time

7   thinking about.

8           The extra time for a phone call or two is probably not

9   going to kill us.  Mr. Gordon, did you want to say something?

10          MR. GORDON:  If it turns out they can't make that

11  decision quickly enough or not reach the Attorney General, if

12  the matter were adjourned briefly, I would have 14 days from

13  the date the judgment is filed to file my notice of appeal.  I

14  will file it sooner than that, so there is no prejudice to

15  Mr. Washington by any delay.

16          THE COURT:  Why don't we do this.  You talk to

17  Mr. Washington about the potential consequences of a short

18  adjournment.  The government can make a call or two to see if

19  there is any even prospect or possibility of an adjournment for

20  taking this higher, and then we'll reconvene in about 10

21  minutes, okay?  If the government needs to make a call here,

22  they can, but you all have phones so you can.  If you want to

23  use the jury room, you can do that, too.

24          (Recess).

25          THE COURT:  Have a seat.  We took a short adjournment

1   so that the lawyers could confer with their respective clients

2   and/or supervisors.  So what did we learn?

3            MR. KASULIS:  During the adjournment I spoke on the

4   phone with the Chief of the Criminal Division, the Deputy U.S.

5   Attorney and the U.S. Attorney about this situation.  I

6   explained what had happened this morning and your Honor's

7   request for better term.

8            They said that it might make sense in an effort to try

9   to find a disposition in this case that will allow the court to

10  sentence Mr. Washington with only a 25-year-mandatory-minimum

11  sentence, to ask Mr. Washington -- not you -- but to find out

12  from Mr. Washington, through counsel, which issues in

13  particular he is interested in pressing on appeal before the

14  Second Circuit.

15           Then if we get that information, we can internally

16  determine whether we would be comfortable with carving out

17  those issues from our normal appellate waiver.  They're just

18  concerned about a blanket appellate waiver where the kind of

19  frivolous argument can be made.  If there are particular

20  arguments Mr. Washington wants to make, we can consider carving

21  that out.  Under those circumstances, Mr. Washington might be

22  willing to sign a post-plea sentencing disposition agreement

23  which would allow us to nolle the 924 (c).

24           THE COURT:  All right.  So that may take a little bit

25  of time?

1          MR. KASULIS:  We spoke about this potentiality with

2    Mr. Gordon and Mr. London right before your Honor took the

3    Bench.  They were trying to think through some issues, but

4    obviously they need to speak about it with their client.  They

5    probably also have to potentially review the record or speak to

6    Mr. Freeman since neither of these gentlemen tried the case and

7    have not spent long enough with the record to make that

8    determination on the fly.

9          THE COURT:  Let me hear from Mr. Gordon to make sure

10   he has conferred with his client about this and his client is

11   on board.

12         MR. GORDON:  I understand he is willing to have the

13   sentence adjourned.  I think probably a week would be enough.

14   Again if we can't work something out, I would file a notice of

15   appeal more quickly than I might otherwise file,.

16         THE COURT:  That is to allay Mr. Washington's concerns

17   of --

18         MR. GORDON:  Right.

19         THE COURT:  Mr. Washington, if we put this over a

20   week, you're okay with that?

21         THE DEFENDANT:  Yes.

22         THE COURT:  That seems to me to make sense.  I will

23   say this.  Look, each of us has an obligation to seek to do

24   justice.  We're not unconstrained in that regard.  Each of us

25   has different institutional and legal obligations and

1    restraints that sometimes limit our ability to do that, but we

2    each have to try to do justice as we understand the term within

3    the confines of our institutional roles.

4            It is true of defense lawyers, prosecutors and judges,

5    so I think it is a good thing that we'll try to discuss this a

6    little longer that people are at least open to considering ways

7    toward what would ultimately be a just or more just sentence.

8            So I commend the government for at least considering

9    this, and I ask Mr. Washington and his lawyers to think

10   carefully about how you want to proceed and what is most

11   important to Mr. Washington going forward.  That being said, it

12   is Mr. Washington's call ultimately whether and what he wants

13   to do on this.

14           MR. GORDON:  Yes, your Honor.  I would hope that

15   during this week the government would consider your suggestion

16   that they try to speak to Mr. Holder also.

17           THE COURT:  Look, the reality is there are good people

18   in the U.S. Attorney's Office.  They understand Mr. Holder's

19   policies and the reasons for them better than I do.  I think

20   they, I am sure, are reluctant to be running things up to the

21   Attorney General every time a judge or a defendant or his

22   lawyer are not happy with the result of the decision-making

23   process within the U.S. Attorney's Office.

24           I am not suggesting, I am not ordering, I am not

25   demanding that this go to Mr. Holder.  I asked the government

1    to consider whether there really is a tension between Mr.

2    Holder's stated positions and the positions being articulated

3    today with respect to the District's policy with respect to the

4    waiver of appellate rights.  It seems to me there was a

5    tension.

6           It is the kind of thing I am sure reasonable people

7    can disagree about.  Look, if the government wants to do that,

8    they can.  I am not ordering them to do it or requesting any

9    more than what I have said.  I have said a lot in this case,

10   and it is simply because I take my role seriously, as I know

11   all of you do, too.  That is the most that I am prepared to ask

12   is that everybody really think long and hard about what role

13   they play in this process and what would be a just sentence

14   within the confines in which we work, which is Congressionally

15   passed and Presidentially signed statutes and mandatory

16   minimums and everything else we have been talking about for

17   months and years.

18          So think about it.  Let me know where we're at, but

19   I'll pick a date for sentencing next week.

20          MR. GORDON:  Would the 12th be possible?  I will have

21   to confer with Mr. Freeman.

22          THE COURT:  We probably could do the 12th, at 2:00

23   o'clock, I think.

24          THE CLERK:  Yes.

25          THE COURT:  All right.  2:00 o'clock on Friday,

EC3JWASC                    Conference

1    December 12th.

2              MR. KASULIS:  Yes, your Honor.

3              THE COURT:  Mr. Washington, that is okay with you?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  It is a little more than a week, but there

6    are a number of things that need to happen before then.  So

7    let's plan on December 12th, at 2:00 o'clock, and then that

8    will be it.  That will be it.

9              MR. LONDON:  I asked Mr. Washington if he wanted me to

10   continue, and he said yes.

11             THE COURT:  All right, so you'll continue.  That date

12   works for you as well, Mr. London?

13             MR. LONDON:  It does.

14             THE COURT:  Good.

15             (Off-the-record discussion)

16             THE COURT:  All right.  Thanks, everybody.  I am sorry

17   that this is getting delayed further, but I think in the long

18   run an extra week or so is a small price to pay for some

19   additional time to consider what is a difficult case.  It is a

20   difficult set of facts and circumstances and it is obviously an

21   important case for Mr. Washington and for the government.  I

22   get that.  All right.  Thanks.  Thank you to the Court Reporter

23   and the Marshals as well.

24             (Court adjourned)

25