```
Ec1dwasc
                              Conference

   UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
   ------------------------------x

   UNITED STATES OF AMERICA,                  New York, N.Y.

              v.                              11 Cr. 0605-2(RJS)

   RANDY WASHINGTON,

                 Defendant.

   ------------------------------x

                                              December 1, 2014
                                              2:35 p.m.

   Before:

                    HON. RICHARD J. SULLIVAN,

                                              District Judge


                            APPEARANCES

   PREET BHARARA
        United States Attorney for the
        Southern District of New York
   BY:  TELEMACHUS KASULIS
        CHRISTOPHER J. DiMASE
             Assistant United States Attorneys

   DAVID A. GORDON
   IRA LONDON
        Attorneys for Defendant
```

Ec1dwasc
                              Conference

1               (Defendant not present)

2               THE CLERK:  Calling the case 11 Criminal 605, United

3       States v. Randy Washington.

4               For the government?

5               MR. KASULIS:  Good afternoon, your Honor.  Kim Kasulis

6       and Chris DiMase for the government.

7               THE COURT:  OK.

8               MR. GORDON:  David Gordon for Mr. Washington.  This is

9       not Mr. Washington; that is Mr. London.

10              THE COURT:  No.  I noticed.  Mr. London is here as

11      well, whom I had appointed as counsel for the purposes of

12      advising Mr. Washington with respect to the most recent offer,

13      which was that the government would withdraw the second 924(c)

14      count in exchange for the waiver of certain appellate rights.

15              I'm informed by the marshals that Mr. Washington

16      declined to leave his cell today.  What was reported to me --

17      and this is all hearsay and secondhand -- is that he claimed he

18      was sick.  Maybe he is sick, I don't know.  But it does create

19      some complications because we are scheduled for sentencing on

20      Wednesday, and the hope was to resolve today what was going to

21      be happening on Wednesday, particularly with respect to this

22      plea offer.

23              So, Mr. London, can you speak to that?  Have you met

24      with Mr. Washington since our last meeting

25              MR. LONDON:  I discussed all the issues with him, and

1    his mind, his opinion, about what to do was unchanged.

2            THE COURT:  All right.  So maybe we just then go

3    forward.

4            I asked Mr. DiMase -- you weren't here Mr. Kasulis,

5    but I asked Mr. DiMase to consider whether or not tethering the

6    offer to the waiver of appellate rights is wise or just.  It

7    seemed to me that the government's offer, which was, you know,

8    I think it showed good judgment and a concern for doing the

9    right thing, which I applaud, but it seems to me that was an

10   offer that was based on doing the right thing, not as a quid

11   pro quo for the waiver of appellate rights, which doesn't seem

12   to me that they are worth 25 years, which is what is, in

13   essence, being traded.

14           So I asked Mr. DiMase to at least think about that and

15   to discuss it with others in his office.  So I don't know if

16   you folks have had a chance to do that.

17           MR. KASULIS:  We have.  Your Honor, we have actually

18   had several meetings, including one this morning.  And the

19   answer is we are disinclined to offer that deal absent the

20   defendant's agreement to enter into the same kind of plea

21   agreement, sentencing agreement, that we require in literally

22   every other case where there is an agreement.  We have done

23   what we believe we can here to try to reach a just result.  If

24   the defendant does not want to enter into that same agreement

25   that literally every other defendant who pleads guilty pursuant

Case 1:11-cr-00605-RJS   Document 125   Filed 12/08/14   Page 4 of 19      4
Ec1dwasc                      Conference

1    to an agreement with the government does, then we can't do
2    anything more.
3              THE COURT:  Look, obviously, I can't force the
4    government to do anything, but it does seem to me -- I'm not
5    sure I completely buy that.  It seems to me the government
6    offered him 10 years -- that's what has been reported to me --
7    before trial, so there was a determination that this crime was
8    worth 10 years.  The 40 more he is going to do are trial
9    penalty and appellate waiver penalty, or the failure to waive
10   appellate rights penalty, and that just strikes me as sort of
11   perverse, in a way, that the crime is worth 10 years but the
12   decision to go to trial and the decision to appeal are worth
13   multiples of that.
14             So, look, I don't think it is worth getting into.  I
15   won't debate about it because there is nothing to debate.  This
16   is all really up to the government's exercise of discretion and
17   I can't second-guess it, and I don't think it is my place to
18   really second-guess it.  But I do think that if we are being
19   motivated -- if the government is being motivated by doing the
20   right thing, I'm not sure that the failure to agree to waive
21   one's rights makes a 50-year sentence any more just or the
22   right thing than it was before.
23             MR. KASULIS:  I'm sorry, your Honor.  I didn't mean to
24   interrupt.  But I am happy to respond to that if you would like
25   to hear our view on that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    THE COURT:  Well, if you would like to speak, then I
2    am not going to muzzle you.
3    MR. KASULIS:  Thank you.  I appreciate what you are
4    saying.
5    We obviously disagree with the characterization that
6    the additional time that Mr. Washington would face had he not
7    and since he did not take that 10-year disposition is a trial
8    penalty.  As your Honor knows, these are the charges that the
9    evidence supports, and they are ultimately since that time the
10   charges that the jury found were all proven beyond a reasonable
11   doubt and unanimously.
12   When we offered the 10-year package, for want of a
13   better term, the 10-year disposition, that is one of the
14   possible sentences that could be reasonable, and the reason
15   that that sentence would have been reasonable is because it
16   allows the government to devote its resources to other matters,
17   investigating other crimes, prosecuting other defendants.  So
18   to say that it is a trial penalty, I have to disagree with.  In
19   fact, those are the charges that the evidence supports, and
20   those are the penalties actually prescribed for those charges
21   in the statute --
22   THE COURT:  That's true, but, I mean, in this case
23   there was a prior felony information that was filed as well as
24   the two 924(c)'s that were filed.  The prior felony
25   information, it seems to me the Attorney General has made clear

1  that you don't do those anymore whether a person goes to trial
2  or not, right?
3             MR. KASULIS:  I can speak to this, too, your Honor.
4             On the PFI issue, we've obviously gone back through
5  the Holder memorandum to make sure that we are exactly right on
6  this.  As your Honor knows, there are several factors that are
7  laid out for the prosecutors for the government to consider in
8  deciding whether to file a prior felony information under 851,
9  none of which is sort of dominant or exclusive as to a totality
10 of the circumstances type of analysis.
11            Here, the one that's most relevant, I think, to this
12 case is the disparity issue, which I know your Honor has raised
13 in other contexts before in this case.  And so our view is
14 we've done more than we usually do in any sort of case for Mr.
15 Washington here in offering to attempt to drop 25 years of his
16 sentence by nolle'ing the 924(c), as to which the jury has
17 found him guilty -- something that we almost never do.  But if
18 he doesn't take that through, as your Honor characterizes it,
19 forfeiting his appellate rights, the usual agreement we use in
20 every disposition case, if he doesn't take that, I believe it
21 is the present intention of our office to nolle the prior
22 felony information regardless pursuant to the Holder
23 memorandum.
24            THE COURT:  So it would be then a 40 year --
25            MR. KASULIS:  That is correct, your Honor.

Conference

1            THE COURT:  -- mandatory sentence, as opposed to a
2    50-year mandatory sentence.
3            Thank you for telling me that.  I think it seems to me
4    that the underlying principle behind the Holder memo with
5    respect to the prior felony information would apply equally, or
6    more so, to a second 924(c) when the offer that was made was a
7    10-year offer, including the decision was made that this is a
8    sentence we can all live with, that justice is not offended by
9    a 10-year deal for this crime, or these crimes.  And they're
10   serious crimes.  I don't think I would have sentenced him to 10
11   years, candidly.  I think I would have been much closer to 20
12   if left with unfettered discretion.
13           I certainly don't take a dim view or suggest that this
14   is not serious criminal conduct, but it seems to me when you
15   offer 10 to say but the price of going to trial is 50, that
16   sure looks like a trial penalty.  And certainly it is not
17   unconstitutional.  The Supreme Court has blessed it in even
18   more egregious or severe circumstances.  But it does seem to me
19   that when a prosecutor is going to exercise discretion and say
20   10 is enough, it's hard to justify and articulate a rationale
21   that would say but 50 is also the right thing because he
22   wouldn't play ball and just give up his right to a trial.
23           MR. KASULIS:  One point in response to that, if I may,
24   your Honor?
25           THE COURT:  Yep.

1           MR. KASULIS:  The Holder memo, I know we think of it

2     in terms of commanding the line prosecutors in the various U.S.

3     attorneys' offices and Main Justice to seek individualized

4     assessments and fair results in every case, and that is

5     undoubtedly true.  One thing that I would point out, as I'm

6     sure your Honor already knows, is the Holder memo distinguishes

7     851 prior felony informations from nolle'ing counts as to which

8     a finding of guilty has already occurred.

9           THE COURT:  I have no question about that.

10          MR. KASULIS:  That is one of the things that I would

11    just reiterate.  I know your Honor knows this, and I apologize

12    for belaboring the point.  But a significant number of things

13    have changed since Randy Washington decided not to take that

14    10-year plea.  We have had a guilty finding on all of the

15    counts of the Indictment.

16          THE COURT:  There is no question about that.  It seems

17    to me the issue is is there an obligation -- not legal but

18    perhaps moral -- when a prosecutor offers 10 years for a crime,

19    or series of crimes, having concluded that this would be just,

20    does that mean you have to take a 50-year deal off the table by

21    the time you've offered that?  Because you've already made a

22    determination as to what would be just, and it's hard to square

23    10 and 50 as both just sentences in the grand scheme.

24          MR. KASULIS:  I hear the Court's concern, but I would

25    point out again that we actually are trying to let him have a

1   mandatory minimum of only 25 years here, and the fact is that

2   he is simply unwilling to enter into the exact same agreement

3   we require of every defendant -- every defendant.  Your Honor

4   knows this very well.  That is the impediment here.  We are

5   willing to try to come down to 25 years.  We are being, in our

6   view anyway, as reasonable as we can be in attempting to

7   disregard part of what the jury said, which gives us great

8   pause, but disregard the jury's verdict as to one of the

9   924(c) --

10          THE COURT:  No.  I think the obligation comes before

11  the jury's verdict, it seems to me, and it is not my place to

12  tell you how to do your job.  I have great respect for these

13  two prosecutors and for the U.S. Attorney's Office in this

14  district.  So don't take it the wrong way.  But it does seem to

15  me that the decision to offer 10 means that you've elected to

16  forgo certain other consequences even if the defendant chooses

17  not to plead guilty or chooses not to give up certain rights.

18          That's not written anyplace.  This is all, I guess,

19  one's view of the proper way to exercise this kind of

20  discretion.  But I say that with humility because I don't have

21  a monopoly on wisdom in this regard.  People might be able to

22  disagree.  But I do think it looks bad, I think, to say we

23  offer him 10 but now he's doing 50 because he wouldn't get out

24  of his own way and he wouldn't let us just dictate terms to

25  him.

Conference

MR. KASULIS: I'm sorry, your Honor. I just point out that we have obviously precedential concerns. We are concerned about other cases as well. We are happy to try to achieve a result in this case, given our individualized assessment mandate, that will allow Mr. Washington to face 25 years. But if we don't require him to plead guilty to this kind of contract that we have literally in every other case, it is something that will be used against us. It is already going to be used against us that we attempted to or made an offer to nolle a count of conviction, something that is almost never done. But to go beyond that and to require us essentially to do that without any commensurate -- "commensurate" is probably not the right word, but any giving up of rights on the other side, even though we make other defendants do it, defendants who never go to trial, who well in advance of trial sign that same agreement, it seems wrong.

THE COURT: Well, what I think seems wrong is to -- it seems to me what seems wrong is to say that it's 10 or 50, and you've got to play ball the way we do it. It seems to me the first inquiry is the prosecutor's decision as to what is a just sentence for the conduct. And that ought to take into account the range of possibilities, including whether or not someone is going to plead guilty.

But at least I'm having trouble squaring 10 and 50 both being just sentences, and, you know, the distinction to be

1    grasped at is, well, he wouldn't plead guilty or he wouldn't

2    waive his appellate rights.  I understand he hasn't agreed to

3    do those things, but 40 years for that seems excessive when 10

4    years for the brutal crimes was deemed to be sufficient.  It

5    seems the waiver of rights is getting a much higher market

6    value than the commission of crimes, and that strikes me as

7    backwards.

8              MR. KASULIS:  We are also concerned --

9              THE COURT:  It is not your concern.

10             MR. KASULIS:  Your Honor, I don't mean to belabor

11   these points any longer than necessary, but I do just want to

12   point out that really at many steps during this litigation we

13   have attempted to try to help Mr. Washington get out of his own

14   way.  We offered this disposition many years ago now, I

15   suppose.  We had a reverse proffer at the request of the

16   defense attorney, who was then Mr. Freeman, where we came in.

17   We explained our evidence in meticulous detail, and we

18   explained to Mr. Washington the different sentencing exposure

19   he would face at different parts of the case.  He had the 10

20   years, or so, offer then, and he would face up to about 50

21   after trial.

22             THE COURT:  No question, I understand all of that.  I

23   just think that, look, what the prosecutors are going to have

24   to live with is, you know, 10 years from now, 20 years from now

25   and 30 years from now and 40 or 50 years from now, if we live

1   that long, will we be proud of this?  Will we look back and

2   say, hey, we had no choice, this had to be done?  Or will we

3   say, naw, this was too much; this didn't need to be this way?

4   Notwithstanding what, I would agree with you, has been an

5   exercise of bad judgment by Mr. Washington all around.  But

6   that's what people with bad judgment do.

7           Anyway, I think you and I, we could debate this at

8   length.  The record should reflect that this was a discussion

9   that has been very respectful and thoughtful and, you know, not

10  contentious in any way.  Sometimes the records don't reflect

11  that, but that is the truth.

12          I don't think we are going to persuade each other.  I

13  think we've each probably developed the record as well as we

14  can, and I don't know what the point of developing the record

15  is because there is really no appeal from any of this.

16          So I'm happy to allow Mr. Gordon or Mr. London to be

17  heard since they have been quiet, and it is rare that I haven't

18  heard either one been quiet for this long.

19          MR. GORDON:  Well, your Honor, by not saying anything,

20  it has gone from 52 years down to 40 years, so.

21          THE COURT:  You are doing great, Gordon.  Keep it up.

22          MR. GORDON:  If it helps with getting it down even

23  further, I would say more.

24          My reaction to Mr. Washington's refusal to accept the

25  government's latest offer, given the poor chances any defendant

1   has on appeal, suggest to me that he is still incompetent, your

2   Honor.  His cognitive impairment prevented him from taking a

3   deal that would have resulted in a sentence in a range of 10

4   years when he was told by the government of the strength of

5   their case, I'm sure he was told by Mr. Freeman the strength of

6   the case, and he was told apparently that he could get 50 years

7   and would get 52 years if he went to trial.  And his cognitive

8   impairment showed he was not living in the real world as far as

9   his chances.

10           It was a crazy decision -- a crazy decision.  And your

11  Honor equated the competency to enter plea discussions with the

12  competency to go to trial.  I think a defendant who can't make

13  the decision whether to take a plea that he has to take,

14  really, how can that defendant determine whether to waive a

15  jury, whether to testify, all the things -- the decisions that

16  you said are part of a trial, how could he intelligently make

17  those decisions when he can't even make the intelligent

18  decision to plead guilty in a case where the proof is

19  apparently overwhelming?

20           THE COURT:  But if that were the measure of

21  competence, then I guess judges could just do all of this and

22  we wouldn't need trials, we wouldn't need guilty pleas.  I

23  would just decide what's in everybody's best interests and

24  leave it at that.

25           MR. GORDON:  No.  But there are two psychologists,

                              Conference

1    your Honor --

2              THE COURT:  Neither of whom said he was incompetent.

3              So, look, I've already made my ruling with respect to

4    his competence.  I don't see his refusal to take this deal as

5    evidence of incompetence.  I think it shows a stubbornness and

6    perhaps a strongly-held belief that he's going to be vindicated

7    on appeal.  Maybe you and I would disagree with the odds of

8    that happening but stranger things have happened and so who

9    knows.

10             MR. GORDON:  Most of the -- assuming he has a chance

11   on appeal, it would seem that other than the issue of

12   ineffectiveness of counsel during the plea discussion phase of

13   the proceedings, all he would get is go back to square one

14   where the government might or might not make a similar offer,

15   and he would then be faced with another trial, another trial --

16             THE COURT:  Just keep doing this over and over until

17   he gets it right?

18             MR. GORDON:  That is if he wins his appeal.  If he

19   loses his appeal, we are talking about 50 years.

20             THE COURT:  Well, now we are only talking about 40 as

21   a mandatory.  Look, I assume the guidelines are higher.  Just

22   so we are clear, the guidelines are actually higher than 40

23   years.  I think they are actually higher than 50 years.  I

24   haven't made my guidelines findings yet, but that's certainly

25   what the government has argued and I think what is in the

1    presentence report.

2            MR. GORDON:  The guidelines, your Honor, at the time

3    of the plea offer, according to in the plea agreement, was

4    nine-and-a-half-years up to 121 months, which is just one month

5    over 10 years.  Those were the guidelines.

6            THE COURT:  No.  I am talking about now what is in the

7    presentence report.

8            MR. GORDON:  But those were the guidelines then.

9            Your Honor, one of the things you didn't mention in

10   your decision with respect to the ineffectiveness argument, you

11   made a finding that because he turned down 10, he would have

12   turned down the plea offer --

13           THE COURT:  I'm saying --

14           MR. GORDON:  -- the precise plea offer, so you didn't

15   have to decide who is telling the truth.  I understand that.

16   Except in my papers I make it clear that he had told counsel --

17   and he says it and prior counsel said it that he told the

18   government -- I mean, he told his lawyer that he would take

19   five years, and his lawyer said he believed that was

20   communicated to the government.  So it's not like the only

21   issues were the difference between seven, nine, 10, which is

22   not much of a difference, but he was willing to take five.

23           THE COURT:  Well, I wasn't giving him five.  If it was

24   capped at five, I might have had no choice.  But in any

25   event --

1           MR. GORDON:  No.  The issue is whether he would
2    take --
3           THE COURT:  He would not be taking five.  He would be
4    taking -- if it were completely structured like virtually all
5    agreements in this courthouse, he would be taking a range that
6    the parties agreed on was the range, which wouldn't be binding
7    on the Court.
8           MR. GORDON:  I understand that, your Honor.
9           THE COURT:  So I think if he took a deal between five
10   and 10 that he thought was going to cap his exposure to that,
11   he would have been sadly disappointed, because there was no way
12   I was going to sentence him to that.
13          MR. GORDON:  Well, your Honor, I understand that the
14   crimes that he was convicted of at trial were quite serious.
15   But my understanding is that prior to his arrest in this case,
16   the most time he's ever served was about 14 months, part of
17   which was for violation of parole.  So a sentence of 10 years
18   would have been a great increment over that.
19          THE COURT:  No question.  But the conduct was
20   incredibly serious, over a long period of time, involving
21   multiple crimes of drug trafficking and gun trafficking and use
22   of weapons in furtherance of crimes of violence and narcotics
23   trafficking.
24          So, in any event, there is only so much we can say
25   without Mr. Washington being here.  We are going to have to

1   cover, I think, a lot of this ground on Wednesday.  Is there

2   any reason to put off sentencing on Wednesday?

3            MR. GORDON:  Well, given the government is going from

4   52 to 40 years, is there any chance that given a little more

5   time they might change their position?  I don't know that

6   Mr. Washington -- my sense is that he doesn't want sentence the

7   sentence put off.

8            THE COURT:  Well, it is more than a sense.  He made

9   that very clear at our last conference.  He does not want this

10  adjourned anymore.

11           MR. GORDON:  However, your Honor, I don't know that he

12  gets to make that decision, necessarily.

13           THE COURT:  No.

14           MR. GORDON:  If there were any chance that the

15  government would reconsider, I think it is in his interest that

16  he be given a little more time to reconsider.

17           THE COURT:  Any chance you are going to reconsider,

18  Mr. Kasulis?

19           MR. KASULIS:  I don't believe so, your Honor.  But if

20  we go back today and we explain what has happened and if

21  someone has a change of heart, we can report that to the Court

22  and defense counsel.

23           THE COURT:  Let's do that, then.  Let's plan to

24  proceed on Wednesday.

25           Mr. London, I didn't mean to cut you short.  Anything

1    else that you would like to say?
2            MR. LONDON:  Nothing.
3            THE COURT:  So you will be here Wednesday.  Just in
4    case Mr. Washington has a change of heart, he can convey that
5    to you.  Would that be all right?
6            MR. LONDON:  You want me here Wednesday?
7            THE COURT:  Yes, if you don't mind.
8            MR. LONDON:  What time is that, your Honor?
9            THE COURT:  What time are we on for Wednesday?
10           MR. GORDON:  I have 10:30.
11           THE COURT:  10:30, right.
12           MR. LONDON:  OK.
13           THE COURT:  All right.  Yes.
14           Anything else we should cover today?
15           MR. KASULIS:  Not from us, your Honor.
16           MR. GORDON:  No, your Honor.
17           THE COURT:  OK.  Well, thanks.  Hopefully,
18   Mr. Washington will come.  I don't like to issue a force order
19   just because that puts people in harm's way, but if it becomes
20   a recurring thing that Mr. Washington just decides not to leave
21   his cell for court appearances, then I may have no choice.  But
22   hopefully he was just feeling under the weather today and
23   that's what prompted his decision not to come.  So I'll presume
24   that's the case until I'm educated otherwise.  And I won't hold
25   it against him in sentencing unless I hear some facts that I

Ec1dwasc
                          Conference

1  have not heard.  OK?
2          All right.  Thanks a lot.  Have a good day.
3          Let me thank the court reporter, as always.
4                           -  -  -