EciQwasS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA

        v.                          11 CR 605 (RJS)
                                            Sentence
RANDY WASHINGTON

                Defendant
------------------------------x

                                        New York, N.Y.
                                        December 18, 2014
                                        4:45 p.m.


Before:

                      HON. RICHARD J. SULLIVAN
                                    District Judge


                         APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
CHRISTOPHER DiMASE
TELEMACHUS P. KASULIS
    Assistant United States Attorney

DAVID A. GORDON
    Attorney for Defendant Washington

IRA LONDON
    Attorney for Defendant Washington

EciQwasS

1          (In open court; case called)

2          MR. KASULIS:  Good afternoon, your Honor.  Tim Kasulis

3   and Chris DiMase for the government.

4          THE COURT:  Good afternoon to each of you.

5          For the defendant?

6          MR. GORDON:  David Gordon for Mr. Washing.  Good

7   afternoon.

8          MR. LONDON:  Ira London for the defendant.

9          THE COURT:  Yes, Mr. Gordon, Mr. London and

10  Mr. Washington, good afternoon to all of you.

11         I apologize for keeping you waiting, I was told that

12  Mr. DiMase and Mr. Gordon were detained in front of another

13  Judge.  So I started something and then I had to finish it.  So

14  my apologies to you.

15         We are here for a sentencing.  The last time we were

16  here we all said a lot, but the upshot was that the government

17  and Mr. Washington were each going to consider different

18  options going forward in light of the topics that we'd been

19  discussing for some time.  So I got a notification from

20  Mr. Kasulis, from the government indicating what their plans

21  were.  Why don't you tell me, Mr. Kasulis, what is on tap

22  today.

23         MR. KASULIS:  Yes, your Honor.  We discussed the

24  matter internally.  At this time the government is prepared to

25  hand to the Court the nolle prosequi, which would dismiss Count

3

EciQwasS

```
 1    Five against Mr. Washington.  We have made the internal
 2    decision that Mr. Washington will not be required to enter into
 3    any sentencing agreement as consideration for the government's
 4    dismissing of its count.  So if the Court is ready to receive
 5    it, we are ready to pass this up.
 6              THE COURT:  OK.  I think that's fine.  Mr. Gordon or
 7    Mr. London, do you have anything to say in response to that?  I
 8    assume no objection, right?
 9              MR. GORDON:  That's correct.  I guess "thank you"
10    would be appropriate.
11              THE COURT:  Perhaps.  It certainly is a gratuitous
12    move by the government that I think speaks well of it and
13    suggests that they take their role very seriously and recognize
14    that in certain extreme circumstances it's necessary to do
15    unusual things, and this is unusual, but I think it is
16    appropriate.  I'm grateful for the government taking the time
17    that was necessary to get to this point.  So thank you,
18    Mr. Kasulis and Mr. DiMase, and also to those in your office
19    because this is not a decision made in a vacuum, and it
20    includes, I'm sure, Mr. Bharara whose signature is on here,
21    though it might be somebody ghosting for him, but I'm sure he
22    was involved, as were others.  So I'm certainly appreciative of
23    it.  So my thanks, and also on behalf of Mr. Gordon and
24    Mr. Washington does the same.  There is a lot that remains to
25    be said today, but we will talk about it, and I am prepared to
```

EciQwasS

```
1    sign the order dismissing the second 924(c) count.

2              Is it Mr. DiMase or Mr. Kasulis?

3              MR. KASULIS:  That's my scrawling, your Honor.

4              THE COURT:  I don't think you put the date on there.

5              MR. KASULIS:  I'm happy to date it if your Honor would

6    like.

7              THE COURT:  I'm happy to let you do it rather than me.

8              This has the effect of reducing the mandatory sentence

9    from 50 years to 25 years.  It doesn't alter the maximum

10   sentence which is still life -- I guess it's life plus five --

11   but it certainly does alter the mandatory sentence which is

12   considerable.

13             Anything else we should talk about before we move then

14   into sentencing?

15             MR. KASULIS:  Not from the government.

16             MR. GORDON:  No, your Honor.

17             MR. LONDON:  No, your Honor.

18             THE COURT:  Let me review with the parties what I have

19   received and reviewed in connection with sentencing.  If I have

20   left anything out, let me know, of course.

21             This is a case in which the verdict was returned by

22   the jury on all eight counts back more than two years ago.  The

23   verdict was March 20, 2012.  In the interim, there have been a

24   lot of motions, changes of counsel, and a variety of

25   back-and-forth that have prolonged sentencing quite an
```

EciQwasS

1    unusually long period of time.

2            I have reviewed, in addition to the trial transcript,

3    which I presided over, the presentence report prepared by the

4    probation department.  It's dated July 6, 2012.  It is a

5    33-page, single-spaced submission that also includes a

6    recommendation.  I have reviewed the sentencing memorandum

7    prepared by Mr. Freeman and Mr. Strazza.  Mr. Freeman has been

8    here for most of these, but he is not here today.  Maybe he's

9    tied up or the time has changed and so he doesn't know.

10           In any event, I reviewed that sentencing memorandum

11   dated August 9, 2012.  It's a five-page, double-spaced

12   submission.

13           I also reviewed the forensic psychological evaluation

14   prepared by Sanford Drob, which is dated October 30, 2012.

15   It's a nine-page, single-spaced report.

16           I reviewed the sentencing memorandum of the government

17   dated July 13 of 2012.  That report is seven pages,

18   double-spaced.

19           I have reviewed then the affirmation of Mr. Gordon in

20   connection with his motion or Mr. Washington's motion to

21   require the government to re-offer its plea which was pretrial,

22   or, in the alternative, to set aside the verdict.  I've already

23   ruled on that motion, but I reviewed the affirmation.

24           More relevant to sentencing, I reviewed the

25   attachments which include, among other things, Dr. Drob's

EciQwasS

```
1    report; also a report from New York Epilepsy and Neurology,

2    PLLC.  That is a report that is from William Barr.  It's seven

3    pages, single-spaced.  It was an exhibit to Mr. Gordon's

4    submission.  I've reviewed all the attachments to that

5    submission.

6            So I will just be clear, and rather than try to

7    characterize them, they are all in the record.

8            I reviewed again my decision of my ruling on the

9    motions.  I've also reviewed the transcripts of the proceedings

10   we had post trial previous to today just to remind myself of

11   what was discussed.  Then I reviewed again the trial testimony

12   related to the statements of the testimony of victims,

13   individuals who were robbed during the course of the various

14   counts of the indictment.  I think it was important to review

15   those again.  I think I have a -- I don't really have victim

16   witness statements from any of the victims though, I have

17   testimony from multiple victims, and there is a reference to a

18   victim statement in the government's submission and also in the

19   presentence report.

20           MR. KASULIS:  I can tell you, your Honor, that I think

21   the victim statement referenced in our submission is based on

22   the one in the presentence report.  I believe it's Mr. Cyrus.

23   We have made efforts to contact the victims in this case, but

24   the ones that testified and the ones who did not at several

25   points during the sentencing litigation as we thought it might
```

EciQwasS

1     be time for them to speak to the Court if they wanted to.  No

2     one has expressed any interest in doing so.

3              THE COURT:  In essence, they did speak to the Court.

4     Some of them at least testified at trial and their testimony

5     was quite graphic and moving.

6              So I reviewed it again, but I was here for it so I

7     certainly reviewed that testimony.

8              Is there anything else I overlooked that should be

9     before the Court?

10             MR. KASULIS:  Nothing we're aware of, your Honor.

11             THE COURT:  Mr. Gordon.

12             MR. GORDON:  No, your Honor.

13             THE COURT:  Let's proceed then with the presentence

14    report.  Mr. Washington, there are a number of factors that a

15    judge has to consider in imposing a sentence.  Among those

16    factors is something called the United States Sentencing

17    Guidelines, which I think you are probably familiar with.  It's

18    this book which is put out by a Commission and it's designed to

19    help judges like me determine an appropriate sentence.  So that

20    is one factor.  There are other factors that I am required to

21    consider as well, including the personal history of the

22    defendant.

23             I also have to consider the facts and circumstances of

24    the crimes involved.  I have to make sure that the sentence I

25    impose reflects the seriousness of the crimes; that it promotes

respect for the law; and that it provides a just punishment for the crimes.

I have to consider the need to deter or discourage you and others to commit crimes like this, so the hope is that the sentence I impose will have the effect of discouraging future criminal conduct by you and perhaps others who will learn about what happened in your case.

I have to consider your needs while in custody.  So to the extent you have medical treatment needs, mental health treatment needs, substance abuse treatment needs, the needs for job training or educational opportunities, those are all things that a court should consider.

I have to also consider the need to avoid what is referred to as unwarranted disparities between the sentence I impose here and the sentences imposed by other judges on other defendants who are charged with similar crimes who have similar criminal histories.  The basic point is that the sentence I impose in this case shouldn't be totally out of line with the sentences imposed on other people who have engaged in similar crimes with similar histories.

To the extent there were wide differences between what judges did in cases that were similar, it might promote disrespect for the law.  It might make people question whether the system was arbitrary.  So judges should consider that as well.

1          My job is to balance all of these factors in reaching

2     a sentence that is appropriate in light of the different

3     factors recognizing that some factors argue in favor of a

4     lengthy, harsh sentence, and others perhaps lean towards

5     leniency; they argue for leniency.  My job is to balance these

6     things.

7          The way we are going to proceed is I am going to first

8     begin with the presentence report to see if there are any

9     objections to it.  To the extent there are, I will resolve

10    those.  Then we will move on to the Sentencing Guidelines and

11    how they apply in this case.

12         Mr. Gordon, are there any objections to what's in the

13    presentence report?  Obviously, this was a trial.

14    Mr. Washington may disagree with the jury's verdict, but are

15    there changes in the presentence report that you would like to

16    articulate at this time and have the Court rule on?

17         MR. GORDON:  Your Honor, I think the parties are in

18    agreement that the guideline calculation has to be changed

19    somewhat.

20         THE COURT:  We will get there in a minute.  The drug

21    guideline has changed.

22         MR. GORDON:  Other than that, no, your Honor.

23         THE COURT:  Mr. Kasulis, is there any objection to

24    what is in the presentence report from the government?

25         MR. KASULIS:  Only, I guess, your Honor, to the extent

EciQwasS

1    that the presentence report conveys that Mr. Washington has

2    been convicted of Count Five which was now dismissed.  I don't

3    know if you want to change that, your Honor, but Count Five

4    comes up in a number of places.

5           THE COURT:  I will make a note here certainly in the

6    judgment that Count Five -- is it Count Five or --

7           MR. KASULIS:  I believe it is Count Five.

8           THE COURT:  Which is the second 924(c)?

9           MR. KASULIS:  I believe it is Count Five, your Honor.

10          MR. GORDON:  It's 6.

11          THE COURT:  I think it's 6, right?  I could be wrong.

12          MR. KASULIS:  I think we moved to dismiss Count Five.

13          THE COURT:  You moved to dismiss Five or Six?

14          MR. GORDON:  I believe it's Six.

15          THE COURT:  I have the nolle here.  Count Five is

16   the -- Count Six is the one we're keeping.  It doesn't matter

17   which one.

18          MR. KASULIS:  That's correct, your Honor.

19          THE COURT:  So Count Five is out.  Count Six is in.

20          That will be reflected in the --

21          MR. GORDON:  Well, your Honor, in which case the

22   presentence report has the wrong punishment.  It says that

23   Count Five punishment was seven years and Count Six the

24   punishment was 25.  So that has to be changed.

25          THE COURT:  Count Five is now out, and the punishment

EciQwasS

1      for Six is the mandatory consecutive five years.

2                  MR. GORDON:  So paragraph 121 has to be changed to 5

3      years.  Paragraph 141 was dismissed and has to be taken out.

4                  THE COURT:  Clearly.  I guess one other thing that

5      should be reflected is that Mr. Bent, who was a co-conspirator

6      and also a cooperator who testified at the trial, has been

7      sentenced in the interim.  He was sentenced to 60 months, I

8      believe.

9                  Let's then talk about the guidelines and how they

10     apply here.  The presentence report begins at page 10 for the

11     guidelines calculation.  Because of the nature of most of these

12     counts -- the robbery counts are Counts One through Four, and

13     robberies are treated separately under the guidelines.  Each

14     one counts as its own group.  The narcotics offense also counts

15     as a separate group, as does Count Eight, the illegal firearms

16     trafficking.  Count Six, which is the 924(c) count, doesn't

17     factor into the guideline analysis.

18                  We will take these robberies in turn.  The October 11,

19     2008 robbery is a base offense level of 20.  I would have

20     thought there would be a two-level enhancement for restraint of

21     victims.  It is not reflected in the presentence report.  I

22     don't think it would ultimately make a difference

23                  MR. GORDON:  Which paragraph, your Honor?

24                  THE COURT:  I am at the October 11 robbery which

25     begins on page 10 at paragraph 37.  It would seem to me that

EciQwasS

there ought to be an additional enhancement under 2B3.1(a)(4),

I think (B) for restraint of victim.  Again, I don't think it

ultimately makes a difference in terms of the guidelines

calculation, but I want to be accurate.  Wasn't that a robbery

in which victims were restrained?

            MR. KASULIS:  They were definitely held against the

wall and the floor, your Honor.  That is the Magic Pot robbery.

I don't recall whether they -- I am pretty sure they did not

use any restraining devices, ropes, handcuffs, zip ties.

Perhaps your Honor already has as to whether physical restraint

alone is enough to trigger that enhancement.

            THE COURT:  I would think it is, but --

            MR. KASULIS:  The problem, I guess, is because robbery

by its very nature involves either force or the threat of the

use of force, some kind of physical restraint might be implied

in every robbery, which obviously cannot be the case.

            THE COURT:  Physically restrained to facilitate

commission of the offense.

            MR. KASULIS:  If you look at the last part, it says

the guideline provides enhancement for robberies where victims

forced to accompany the defendants to another location, which

did not happen, or was physically restrained by being tied,

bound or locked up.

            THE COURT:  You're referring to?

            MR. KASULIS:  I guess the commentary note 6 under

EciQwasS

1    background, 2B3.1.  It is literally the last sentence of the

2    commentary.

3            THE COURT:  Tied, bound or locked up.  So people were

4    forced under the bar in this case.  This is the Magic Pot

5    robbery.

6            MR. KASULIS:  My memory is the Magic Pot, your Honor.

7            THE COURT:  I won't add it.  It doesn't make a

8    difference under the guidelines.  It is certainly a relevant

9    factor in sentencing but not under the guidelines.  A base

10   offense of 20 and no enhancements for that one.  For the

11   924(c), that is out.

12           MR. KASULIS:  No, the gun is in for that one.

13           THE COURT:  Count Five, was the gun count associated

14   with the Magic Pot?

15           MR. KASULIS:  No.  I believe Count Five is the gun

16   count associated with the August 18, 2010 robbery which is

17   labeled group three, but is in fact group two which is somewhat

18   confusing.

19           THE COURT:  There is an enhancement for the October 11

20   for a gun or no?

21           MR. KASULIS:  For the October 11, no.  Because he was

22   in fact convicted of the 924(c).

23           THE COURT:  That is Count Six.

24           MR. KASULIS:  Correct, your Honor.

25           THE COURT:  Count six is associated with the

EciQwasS

 1   October 11 robbery.

 2              MR. KASULIS:  That's correct, your Honor.

 3              THE COURT:  That is still the case.  I want to make

 4   sure it depends which one is out.

 5              The October 12, 2010 robbery is also base offense 20.

 6   There is no 924(c) with this count.  So that is a plus six

 7   because the firearm was used to pistol whip a victim.

 8              MR. GORDON:  What date did you say?

 9              THE COURT:  October -- excuse me -- August 12, 2010.

10              MR. GORDON:  You said October.

11              THE COURT:  Did I?  Sorry.

12              MR. KASULIS:  I should just clarify something, your

13   Honor, before we move on.  In group one, the October 11, 2008

14   robbery is actually Count Three according to the PSR which I've

15   got here.  If you look at paragraph four, Count Three is

16   October 11, 2008 which probation has labeled group one because

17   they are doing it in chronological order.

18              THE COURT:  Yes.  Since we've now dropped one of the

19   924(c)'s, I want to make sure I haven't missed which

20   substantive robbery count or robbery group no longer has a

21   924(c), in which case it should get two levels for a gun.

22              MR. KASULIS:  That's group three, your Honor.

23              THE COURT:  We're coming there.  August 12, base

24   offense 20 plus six for use of a firearm to pistol whip someone

25   plus two because this is a case where the victim was in fact

EciQwasS

1    tied up.  That takes us then to level 28.

2              Group three is the August 18, 2010 robbery.  That is a

3    base offense level of 20.

4              MR. DiMASE:  Judge, I'm sorry.  I think you may have

5    misspoke on the August 12 robbery.  Two levels were added

6    because of physical injury to the victim, not restraint.

7              THE COURT:  I'm sorry, you're right.

8              MR. DiMASE:  I believe the testimony was that in the

9    course of that robbery, the elderly gentleman who lived in the

10   Bronx Park South apartment building was pistol whipped by

11   Mr. Washington and sustained injury.  Again, I don't believe

12   there was any testimony of restraint.

13             THE COURT:  I misspoke.  Yes.  I was thinking of

14   another robbery.

15             August 18, 2010 is a base offense level of 20.  This

16   one now should have an enhancement for a firearm.  How much of

17   an enhancement?

18             MR. KASULIS:  I believe, your Honor, it should be a

19   five-level enhancement because the gun was brandished.

20             THE COURT:  Mr. Gordon, do you agree with that?

21             MR. GORDON:  Yes, sir.

22             THE COURT:  This is one where the victims were

23   physically restrained, so two levels are added to that.  Then

24   this is also a one-level enhancement because the robbery

25   involved the theft of drugs.  So this then should be adjusted

EciQwasS

1  to level 28, correct?

2          MR. KASULIS:  Yes, your Honor.

3          THE COURT:  Then we have group four, which is the

4  narcotics count.  Here I will change the calculation under

5  paragraph 58 because the guidelines have since changed.

6          Mr. Washington, just so it's clear, this book is

7  different than the book that existed at the time you were

8  convicted or the time you were charged, and the guidelines

9  calculation for drug amounts has gone down.  So this is a

10  two-level benefit that accrues to you.  You are better off by

11  two levels because of changes that have since been made in the

12  guidelines manual.  So instead of it being level 34 based on

13  the amount of crack and heroin and marijuana, we are instead at

14  level 32.  So the total offense level is 32.  No enhancement

15  for gun in connection with this.

16          MR. KASULIS:  Your Honor, the firearms really seem to

17  be used by the crew for the robberies.  I don't recall any

18  specific testimony on that point.

19          THE COURT:  Then we have the illegal firearm

20  trafficking which is Count Eight, group five.  It's a base

21  offense level of 22 pursuant to Section 5K2.1(a)(3).  A

22  four-level enhancement based on the number of guns, which was

23  between 8 and 24.  Another four-level enhancement because the

24  defendant engaged in trafficking firearms as that term is

25  defined under the guidelines.  So that is a total offense level

EciQwasS

1    of 30.

2              That means then for group one, we're at 20; group two,

3    28; group 3 is also 28; group four, 32; and group five, 30.  So

4    the greatest offense level is 32.  Zero units for group one;

5    one unit for group two; I think it's one unit for group three;

6    and one unit each for groups four and five for a total of four

7    units.  Do you all agree with that?

8              MR. GORDON:  Yes.

9              MR. KASULIS:  Yes, your Honor.

10             THE COURT:  That's four levels.

11             MR. KASULIS:  That's correct, your Honor.

12             THE COURT:  That then puts us at level 36.  32 plus

13   four is level 36.

14             With respect to criminal history category, there are

15   multiple prior convictions that Mr. Washington had.  The only

16   one that counts for purposes of the guidelines are conviction

17   for a 2005 controlled substance offense that got him 18 months

18   imprisonment and three points for that.

19             Then another 2005 conviction also for controlled

20   substances.  That got him time served or one criminal history

21   point.

22             Two more for an October 2005 controlled substance

23   offense.  That's two levels.

24             Another criminal history point for a 2008 controlled

25   substance offense.

EciQwasS

```
1          Then another criminal history point for a second
2     November 2008 conviction for criminal possession of marijuana.
3          A 2009 conviction, also for criminal possession of
4     marijuana.  So he gets another point.
5          So the total number is nine points, which is Criminal
6     History Category IV.
7          Does everybody agree with that?
8          MR. GORDON:  Yes, your Honor.
9          MR. KASULIS:  May I just have one moment, your Honor?
10    I'm sorry.
11         THE COURT:  Yes.
12         (Pause)
13         MR. KASULIS:  Yes, we agree, your Honor.
14         THE COURT:  You agree.  That then puts us at level 36.
15    Criminal History Category IX, which is 292 to 365, correct?
16    I'm sorry, it's 262 to 327.
17         MR. KASULIS:  Yes, that's right, your Honor.
18         THE COURT:  Plus a mandatory 60 consecutive as a
19    result of Count Six.  So those are the guidelines, and that's
20    how they apply in this case.  There is a mandatory 20 years on
21    the narcotics count which is Count Four.  I think that's right,
22    Count Four.
23         MR. KASULIS:  I think it is group four, your Honor, I
24    think it is actually Count Seven.
25         THE COURT:  Yes, I'm sorry Seven.  Count Four is
```

1    irrelevant.  So the lowest end I can impose is 25 years by law.

2    The guidelines range is 262 to 327 plus 60, so basically that's

3    about 27 to 32 years.

4              MR. GORDON:  Just under 27.

5              THE COURT:  Yes, approximately.  Just in case, putting

6    it in terms of years helps.  So those are the guidelines.

7              Let's then talk about the other factors.  Mr. Gordon,

8    I will hear from you first.  Then I will hear from the

9    government.  Then, Mr. Washington, if there is anything you'd

10   like to say, you certainly have the right to speak.  You are

11   very welcome to.  You're not required to, but you'd be welcome

12   to.

13             Mr. Gordon.

14             MR. GORDON:  Your Honor, it seems to me that under all

15   the circumstances, the mandatory minimum is more than enough.

16   Your Honor can't sentence any less than that but it seems to me

17   anything above that would be greater than necessary to meet the

18   objectives of sentencing.

19             The government offered a plea which was in the range

20   of ten years.  There's a mandatory minimum of only seven, the

21   guidelines were nine and a half years to just over ten years.

22   Mr. Washington didn't accept responsibility and went to trial,

23   but he didn't testify.  He didn't commit perjury, and he had

24   indicated that he would have taken five years, your Honor.  I

25   interpreted that as being that he would have take a sentence --

EciQwasS

he would take a plea where the sentence would be five years,
but that's not what was told to the government and that's not
what he said.  He said he'd take five years.  It seems to me if
a mandatory minimum is five years, he might very well have
taken that too.

I'm sure Mr. Freeman did not tell him that it would be
a promise because it's never a promise.  So there was no way
there could be a promise of a five year sentence.  He showed a
willingness to dispose of this case without a trial.

It didn't work out.  He went to trial.  Two
psychologists said that the reason he didn't take the plea may
very well have been that his serious cognitive impairment
prevented him from realizing just how desperate the situation
was and prevented him from realizing the consequences that
would exist if he went to trial and lost.  Two psychologists
said that.  Mr. Freeman in his letters to the court indicated
that he believed that Mr. Washington himself didn't get it.

The cooperator in this case, I understand he
cooperated and he was rewarded for his cooperation.  But his
sentence was five years, and this guy, my understanding is that
he admitted to at least 40 robberies, many that he said he did
not do with Mr. Washington.  So he committed many, many more
robberies than Mr. Washington and he got a sentence of five
years in this case.  The government thought somewhere in the
ten year range was sufficient.

EciQwasS

1          The mandatory minimum in this case is 25 years in

2     large part because of a prior felony that Mr. Washington had

3     from upstate where he was convicted of attempted sale of what I

4     understand was a couple of bags of, I think it was, cocaine --

5     a couple bags of cocaine has doubled the mandatory minimum for

6     the drug offenses in this case.

7          THE COURT:  That's true, but that's almost academic at

8     this point since the guidelines range is above that.

9          MR. GORDON:  But the guidelines are advisory, and the

10    mandatory minimum is not.  Mandatory minimum is what it is

11    irrespective of the nature of a prior felony.  The prior felony

12    could have been a hundred kilos or it could be a couple bags of

13    coke.  In this case, it was a couple bags of coke.  I think

14    that's the difference.  There are prior felonies and there are

15    prior felonies.  Even though his prior felony was a lot less

16    serious, he is now facing a mandatory minimum of 20 years

17    because of a prior felony, plus the extra five years for the

18    gun, which I understand.

19         These are crimes that he committed in his twenties.

20    The longest time he has ever spent in jail was a total of 14

21    months, part of which was for a violation.  I think he was

22    released after a short period of time, then he violated and

23    went back.  The total amount of time that he served was 14

24    months.  So he's not like somebody who got sentenced to five

25    years, ten years, and didn't learn is lesson.  Maybe he was

EciQwasS

1    treated too leniently in the past, but in fact he was treated

2    leniently.  He never served more than 14 months.  I don't think

3    he needs a sentence greater than 25 years to teach him a lesson

4    so he won't do it again.  He is going to be well, well into his

5    middle age when he gets released even if your Honor gives him

6    the minimum sentence that is available.

7         It just seems to me under all the circumstances, a

8    sentence of 25 years is more than necessary, but your Honor has

9    to impose that, but I think anything else would be too much.

10        THE COURT:  Thank you, Mr. Gordon.

11        Mr. Kasulis or Mr. DiMase?

12        MR. KASULIS:  Just a few short points, your Honor.  We

13   know the Court is very familiar with this case, having presided

14   over the trial and the post trial litigation.

15        Comparing the defendant's prospective sentence, a

16   guidelines range mandatory minimum sentence, to a cooperating

17   witness is really apples and oranges.  The Court is very

18   familiar with Mr. Bent's situation.  It's entirely different

19   from Mr. Washington at every phase after the criminal conduct

20   occurred.  They essentially took two different roads in the

21   woods.  That's what factored into the Court's sentence for Mr.

22   Bent, which was still a custodial sentence of five years.

23        Mr. Washington, even if we were to focus only on the

24   drug crimes at issue here, moved over two kilograms of crack

25   cocaine, which is an extraordinarily serious drug, was involved

EciQwasS

1    in trafficking of heroin, and moderate amounts of marijuana,

2    200 pounds or so that were brought in from California for

3    distribution.

4         In addition to that, there is the firearms

5    trafficking.  Mr. Washington would go down South to the

6    Carolinas and bring back guns to essentially sell illegally on

7    the streets of New York.  These included occasionally assault

8    rifles, tremendously dangerous weapons.  That's before we even

9    begin to consider that Mr. Washington was a pivotal member of a

10   violent robbery crew that was demonstrated at the trial.

11        These guys were vicious.  They would go into

12   commercial establishments, they would push into people's homes.

13   They would restrain victims.  They would pistol whip victims.

14   They would hold them at gunpoint.  They were essentially

15   opportunists.  Mr. Washington was is the best example of that.

16   If he could make money selling drugs, he would.  If he could

17   make it stealing drugs, he would.  If he could make it robbing

18   commercial establishments like the Magic Pot, he would.  If he

19   could do it by selling AK-47's in New York, he would.

20        So it is a huge band of criminal conduct here:

21   significant drug crimes, significant violent crimes and

22   significant firearms-trafficking guidelines that leads us to

23   advocate for a guideline sentence in this case, which is two

24   years or so north of the mandatory minimum.  We believe that

25   the victims require that, the crimes are serious, and that it

EciQwasS

1    is appropriate in this case.

2              THE COURT:  Thank you, Mr. Kasulis.

3              Mr. Washington, is there anything you would like to

4    say before I impose sentence?

5              MR. GORDON:  He advises me, your Honor, he has nothing

6    to say.

7              THE COURT:  That is fine.  As I said, you have a right

8    to speak, but you are not required to, and certainly, your

9    sentence won't be any worse because you chose not to speak.  I

10   think that would be inappropriate.

11             Let me tell you the sentence I intend to impose and my

12   reasons for it.  Once I have finished, I will then check with

13   the lawyers to make sure I haven't made any errors or done

14   something illegal.  Then assuming I haven't, then I will

15   formally impose the sentence.

16             Judges in our system have to explain their reasons,

17   and I think that is a good thing; it is important that a

18   defendant understands what was going through the judge's mind

19   and doesn't have to wonder or guess as to what was in the

20   judge's mind.  I think it is also important that the public can

21   understand what went into the sentencing as well.  We have a

22   court reporter taking all of this down.  So it is all part of

23   the record.  Again, I think that is also a good thing.  It is a

24   strength.

25             This is a case that certainly has occupied a lot of my

time, a lot of everyone's time.  We have been at this for quite

awhile.  I've talked at length at prior sessions about the

responsibility that all of us have -- lawyers and judges -- to

do the right thing, within our own roles, within the

constraints that those roles carry.

        Mr. Gordon certainly has been a very zealous advocate.

He's worked very hard to make sure that the sentence you

receive is lower than it might otherwise have been.  I think he

has been an admirable advocate.  I could say the same for

Mr. London, who came into the case in a more limited role.  I

could say the same for Mr. Freeman who I thought was very

zealous in his advocacy.

        The government has a different role.  Their role is to

investigate and prosecute serious crimes.  That's what they did

here.  I think these were incredibly serious crimes.  I think

the government is to be commended for investigating and

building a case relating to these crimes.  It was important

that they do it.  I think they did a good job of it.  I thought

they tried the case very well and beautifully in a case that

was important, very important.

        The government's job is complicated.  They have a lot

of different things they need to do that includes plea

discussions plea offers, it also includes decisions about

mandatory minimums in sentencing.  We've talked about that.  I

have never faulted the government for bringing the charges they

EciQwasS

1  brought.  You never know what a jury will do or what they will

2  come back with; but it did seem to me that when the dust

3  cleared, and we were confronted with a 52-year mandatory

4  minimum, which I guess later by subsequent rulings from the

5  Supreme Court became a 50-year mandatory minimum sentence, that

6  struck me as extreme.  I shared those views with the government

7  and asked them to consider whether this was the right thing,

8  because they, like me, and Mr. Gordon, and all lawyers have to

9  consider what is the right thing.

10          To their credit, they thought long and hard about

11  that.  We have gone back and forth on this quite a bit.  I felt

12  bad actually that some press stories actually sort of

13  accentuated, I think, the most adversarial exchanges between me

14  and Mr. Kasulis when it was all done, I thought, very

15  respectfully.  I never accused Mr. Kasulis of being

16  unprincipled or pig-headed or anything like that.  His office

17  and he have institutional concerns that Mr. Gordon, and I don't

18  have.  And I respect that.  I understand that.  It just it

19  seemed to me that on these facts, 50 years mandatory was too

20  much.

21          They evidently have ultimately agreed, and I commend

22  them for it.  I certainly feel better about going forward today

23  being freed from the requirement that I impose a 50-year

24  sentence.  So now I have much more discretion, and I get to do

25  what I consider to be the right thing.

EciQwasS

1          You have heard about all the things, Mr. Washington,

2     that I have to consider.  I have to consider them, and I have

3     to balance them.  That is, frankly, the most important thing I

4     do.  That is the hardest thing I do.  It is something I don't

5     get great joy out of.  It is never enjoyable to pass judgment

6     or to impose a sentence on another human being.  It is not

7     something I look forward to or leave feeling rejuvenated by,

8     but it is important and I take it seriously.  I think the

9     record over the last many months reflects that.

10          So now I get to focus on the factors I talked about

11     before.  So I look at you, Mr. Washington, and I think, my

12     goodness, this is a person who has done an awful lot of harm.

13     And I've talked about the lawyers and struggling to do the

14     right thing and my struggle to do the right thing in this case.

15     But I have to say, just looking at everything I see in this

16     record, it doesn't seem to me that you have worked very hard to

17     do the right thing at any point.

18          It seems to me that you have been sort of a human

19     crime wave; that you have been a thug; you have terrorized

20     people for no good reason; and almost sadistically so.  The

21     robberies that were described at trial, and set forth in less

22     detail in the presentence report, showed a callousness and a

23     cruelty that is really troubling.  The testimony of the

24     witnesses at trial conveyed the fear that they were

25     experiencing, the pain that many of them experienced, and it

EciQwasS

showed just the brutality of this conspiracy and the brutality
of you, you seem to be among the most violent of anyone
involved in the robbery conspiracy or the individual robberies.

There has to be a penalty for that. But it is not
just that, because these are also robberies of course that
include guns, but we also have gun trafficking. Mr. Kasulis
has touched on this. But these were serious guns that were
capable of inflicting massive amounts of harm. It's hard to
know what harm was that was inflicted by these guns, but
certainly they were capable of immense harm and death.

We have drug trafficking of serious drugs -- heroin
and crack -- which destroy lives and families and entire
communities. And all this after you have been repeatedly
prosecuted in the system, repeatedly convicted and sentenced
and just would return right to it.

I thought one of the most telling and really troubling
things that I learned during the trial was a recorded call at
the jail at Rikers in which you are discussing, Mr. Washington,
your plans for when you get out. Your plans don't include to
sort of get out of all of this, but rather to inflict some sort
of harm and vengeance on your co-conspirators who didn't help
you post bail and then to engage in kidnapping as a better type
of criminal activity when you get out.

So it seems that you were not scaling down. You were
getting ready to scale up. So, look, I'm left with a picture

EciQwasS

of somebody who is incredibly dangerous, incredibly violent,
somebody who has not an ounce of remorse.  I have to say that a
lengthy sentence is clearly appropriate here.  I was balking at
50 years, and I think appropriately so.  50 years is too much.
I think that is wrong, but there is no question you deserve a
lengthy sentence.

One of the things I didn't really like about this
being a 50-year mandatory minimum sentence is it almost
converted the defendant, the perpetrator of these crimes, into
a victim, which I think is very unfortunate.  So now I think
because of the government's decision, wise decision in my view,
to withdraw, to dismiss the second 924(c) count, it seems to me
that any argument Mr. Washington is a victim goes away.

So I never intended to sentence Mr. Washington to
anything less than 20 years.  This was way back when, once I
became aware of the general nature of his conduct.  Everything
I saw at trial persuades me that a longer sentence is
appropriate.  The mandatory minimum sentence here is 25 years.
That's a lengthy sentence; no question about it.  But the
guidelines are higher than that.  And I don't think the
guidelines have it wrong here.  I don't.

So the sentence I intend to impose is a guideline
sentence.  I intend to sentence Mr. Washington to 22 years on
Counts One through Four, Seven and Eight to run concurrent, to
be followed by a consecutive mandatory consecutive term of 60

EciQwasS

1   months or five years on Count Six.  That's a total of 27 years.

2   That's almost as long as Mr. Washington has been alive.  I just

3   think the amount of harm and damage inflicted by Mr. Washington

4   in his short life merits a sentence of that kind.

5          That's the sentence I intend to impose.  Is there any

6   legal impediment to my imposing it, Mr. Kasulis?

7          MR. KASULIS:  Perhaps a quite technical one, your

8   Honor.  The statutory maximum on the substantive robbery on the

9   robbery conspiracy is 20 years.  When your Honor said that you

10  intend to impose 22 years on Counts One through Four, Seven and

11  Eight, I think it can only as a technical matter be 20 on the

12  1951 counts.

13         THE COURT:  I will be clear about this.  It will be

14  concurrent up to 22 years on the lengthy yes, sir count think

15  is Count Seven, but all of those do run concurrent, so I will

16  make that clear in a moment.  But, thank you, that is the

17  correct catch.

18         Mr. Gordon?

19         MR. GORDON:  Nothing from me.

20         THE COURT:  Mr. Washington, let me ask you to stand.

21         Mr. Washington, having presided over your trial and

22  being present when the jury returned guilty verdicts on each of

23  the eight counts of the indictment, now it's seven counts of

24  conviction because one has been dismissed by the government,

25  but I sentence you as follows:

EciQwasS

1          I sentence you to a term of 20 years on Counts One

2     through Four, 22 years on Count Seven, and the maximum on Count

3     Eight I think, is five, so five years on Count Eight for a

4     total of 22 years, all to run concurrent.

5          In addition, I will impose a 60-month or five year

6     mandatory consecutive sentence on Count Six.  So that will run

7     after you have finished serving the terms on Counts One through

8     Four, Seven and Eight.  That is the prison term.

9          With respect to supervised release, I will impose a

10     term of supervised release of life on Count Seven, three years

11     each on Counts One through Four, Eight, and I guess also Six,

12     all to run concurrent.

13          I am not going to impose a fine.  I don't know that

14     there is any point because it appears Mr. Washington doesn't

15     have the ability to pay a fine.

16          The government is not seeking restitution at this

17     point?

18          MR. KASULIS:  Your Honor, we looked into that.  The

19     four independent robberies is a robbery of drug proceeds and

20     cannot be a basis for restitution.  There was no real taking in

21     the Bronx Park/South Bronx where the only thing that was stolen

22     was a cell phone.

23          With regard to Magic Pot the individual victims, the

24     customers lost a de minimus amount of money.  The institution,

25     the Magic Pot, itself lost funds.  However, our attempts to

EciQwasS

1    interface to contact the former owner of the Magic Pot have

2    failed.  He didn't return any calls from the agency.  The Magic

3    Pot closed shortly after robbery.

4              THE COURT:  And then forfeiture?

5              MR. KASULIS:  We're not seeking forfeiture.

6              THE COURT:  I won't impose restitution or forfeiture.

7    No fine either.  I will impose a special assessment of $700;

8    that is, $100 for each count of conviction.

9              With regard to supervised release, there are terms and

10   conditions associated with it, so I should tell you what these

11   are.  There are standard conditions, 13 in all, that are

12   imposed in virtually every case involving supervised release.

13   I will impose those.

14             I will also impose the following mandatory conditions:

15   First, that you will not commit another federal, state or local

16   crime.

17             Second, that you will not illegally possess a

18   controlled substance of any kind.

19             Third, you will not possess a firearm or destructive

20   device of any kind.

21             Fourth, you will participate in the collection of DNA

22   as directed by the probation officer.

23             In addition, there are special conditions that I am

24   going to impose.  One is that you will participate in a

25   vocational, educational training course as approved by the

EciQwasS

1   probation office.

2          The second is that you will participate in a substance

3   abuse treatment program approved bite probation office.  That

4   program will include testing to determine if you have reverted

5   to the use of drugs or alcohol.  I will also authorize the

6   probation office to receive evaluations and the results of drug

7   tests from the treatment provider.  I will also authorize

8   probation to share probation's tests and evaluations with the

9   treatment provider as necessary.

10          I will order that to the extent you are able to help

11   defray the cost of that program, Mr. Washington, either because

12   you are working or you have access to insurance, I will order

13   that you do help to defray the cost of that program.  To the

14   extent you can't afford to pay or defray the cost of the

15   program, then the court will bear the cost because I think it

16   is important that you participate in that program.

17          I am also going to order that you participate in a

18   mental health treatment program.  To the extent it can be

19   combined with the substance abuse treatment program, I think

20   that would be fine.  Otherwise, if it needs to be a separate

21   program, then that will be the case because I think that is

22   important also with the same conditions that you contribute to

23   the cost of that program if you are able to.

24          Finally, you shall submit your person, your residence,

25   your place of business, your vehicle, or any other premises

EciQwasS

under your control to a search in the event that the probation

officer believes that there is evidence of contraband or

evidence of a violation or a crime that could be found in those

premises.

          You have an obligation to consent to that search if

requested.  The request will be made in a reasonable manner and

the search will take place at a reasonable time and in a

reasonable manner.  You will also have to let anybody with whom

you share these premises know that you are subject to a search.

If you are living with other people, you have to tell them "I

am subject to search requirement as part of my supervised

release."

          I will direct that you be supervised in the district

of your residence.  I will direct you report to probation

within 24 hours of your release from custody, unless the next

day is a weekend or a holiday, then appear the next business

day.

          As I said, I am not going to impose a fine.  I am not

going to order restitution or forfeiture.

          I will order a special assessment of $700.

          Are there open counts?

          MR. KASULIS:  Yes.  We move to dismiss them, your

Honor.

          THE COURT:  I will dismiss any open counts.

          I should tell you, Mr. Washington -- I think you

EciQwasS

probably understand this already -- you have a right to appeal
this sentence and the jury's verdict.  If you wish to appeal,
you would need to file a notice of appeal within two weeks.  I
guess two weeks from tomorrow is when I will get the judgment
out.  That's a pretty strict deadline.  It doesn't mean the
brief has to be in by then, but you have to file a notice of
appeal by then.

            MR. GORDON:  I will do so, your Honor.

            THE COURT:  Talk to Mr. Gordon.  He will assist you
with that.  The fee associated with this will be waived because
you can't afford to pay the fee, so you needn't worry about
that.

            MR. GORDON:  Two matters, your Honor:

            One, is will you recommend to the Bureau of Prisons
that he be designated to a facility close to New York so his
family can visit him?

            THE COURT:  I will make that recommendation, yes.

            MR. GORDON:  The other, your Honor, is if you look at
paragraph 109 on page 18, it reflects a state arrest on
February 23, 2011.  That was the arrest resulting from the
search that was done which your Honor heard lots of evidence
about, and that was the motion to suppress that Mr. Freeman
brought.  He spent from February 23, 2011 in state custody
state in detention in the state until he was brought over here
on June 15, 2011.  That four-month period, since no charges

EciQwasS

```
1    were dismissed, it was not applied to any state sentence, I
2    would ask your Honor either give him credit for that time
3    towards his sentence, or if your Honor can't do that, if you
4    would recommend to the Bureau of Prisons that they do it
5    because the facts of that case were certainly part of this
6    case.
7             THE COURT:  It's not clear to me from the probation
8    report whether that's true.
9             MR. GORDON:  I think the government will acknowledge
10   that that is the case.
11            THE COURT:  Is that right?
12            MR. KASULIS:  I believe that's true, your Honor.  We
13   have no objection to your recommending to the Bureau of Prisons
14   that they include that in their calculation.
15            THE COURT:  Again, there is not much I can see from
16   the presentence report as to whether it's the same offense or
17   not.  If the parties agree to that, and there is no dispute --
18            MR. GORDON:  If you read paragraph 110, it talks about
19   two firearms, crack cocaine and marijuana was seized.  It was
20   the same search.
21            THE COURT:  I have no reason to doubt you, but it is
22   not clear from the presentence report given the number of other
23   arrests and the nature of those arrests, that the mere fact
24   that they both involve two firearms, crack cocaine and
25   marijuana would seem to put this in very select company, but
```

EciQwasS

```
 1   since there is no dispute, then I will make the recommendation.
 2              MR. GORDON:  Thank you.
 3              THE COURT:  Is there anything else we should cover
 4   today?
 5              MR. KASULIS:  Not from the government, your Honor.
 6              THE COURT:  All right.  Mr. Gordon, anything else?
 7              MR. GORDON:  Nothing.
 8              THE COURT:  Let me thank Mr. Gordon.  Let me thank
 9   Mr. London.  Let me thank also the court reporter and the
10   marshals for being here today.
11              Let me thank the government for considering the
12   various arguments I made.  This was a rare case, and it's a
13   case that I think merited an examination of the sentence and of
14   mandatory minimums and how we got there and as to how we might
15   proceed.  I think it is good that everybody involved in this
16   system take a hard look at those things from time to time in
17   special cases.  So I think what happened here was a good thing.
18   It, I think, enhances the reputation of the institution and
19   ultimately that is also something that is of importance to
20   everybody, everybody who participates in it, whether a lawyer a
21   judge or as a defendant or in any capacity.  So I was gratified
22   by that.
23              So thank you.  OK?  Good luck to you all.
24              Mr. Washington, good luck to you.  That's a lengthy
25   sentence.  It's not lost on me.  I do think that you are a
```

EciQwasS

1    young man, so you will serve the sentence, and you will

2    eventually be back out.  My hope for you is that this will all

3    be behind you, and you will then lead a life that is peaceful,

4    productive and happy.  I think you deserve that.  So that is my

5    hope for you.  But certainly the crimes committed were

6    incredibly serious and the people who were the victims of those

7    crimes, I think are likely still dealing with some of the harms

8    you inflicted, so you should think about that too.

9              Thank you all.  Have a good day.

10              (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25